[No. 6659–1. Division One. September 17, 1979.]

JOHN COGAN, *Appellant,* v. KIDDER, MATHEWS &
SEGNER, INC., ET AL, *Respondents.*

*Scott W. Wyatt,* for appellant.

*Keller, Rohrback, Waldo & Hiscock, Pinckney M. Rohrback, Thom, Navoni, Hoff, Pierson & Ryder, Richard W. Pierson, Skeel, McKelvey, Henke, Evenson & Betts,* and *W. E. Evenson,* for respondents.

DORE, J.—This is an action brought on behalf of the Joseph C. Banchero estate against a real estate brokerage

firm and their agents, for recovery of real estate commissions. The trial court awarded a judgment to plaintiff for $660 damages. Plaintiff appeals. Defendants cross–appeal.

## ISSUE

Whether or not defendant real estate firm and its agents violated its fiduciary duty to the Banchero estate, negating its right to a real estate commission.

## FACTS

On April 6, 1976, John Cogan, the executor of the Banchero estate, wrote to six real estate firms in the King County area inviting them to list for sale a 10–acre parcel of real estate located in Tukwila, Washington. One of the firms contacted was Kidder, Mathews & Segner, Inc. (hereinafter referred to as Kidder, Mathews). In his letter to this firm plaintiff pointed out that his asking price was $280,000; however, he indicated that this was a distress figure.

Kidder, Mathews, upon receiving Cogan's letter, contacted him by phone and agreed to list the property for sale. Russell Segner and Jerome Mathews of that firm showed the property to prospective purchasers, including Allied Body Works, Inc., hereinafter referred to as "Allied," a commercial truck and trailer body manufacturer. Mathews also showed the property to Paul Ginn, an individual with whom Mathews had been in a property joint venture since 1962. On June 8, 1976, Ginn signed an earnest money agreement on the property for $280,000 cash.

On June 28, 1976, Cogan also signed the agreement but first modified it by inserting language providing the commission of $19,000 would only be payable "if and when the sale closes."

Throughout the fall of 1976, communications between plaintiff and the defendants were limited to routine discussions about the conditions of sale and the likelihood of their being resolved. The testimony relates that on September 24, 1976, Ginn told Mathews that he would sell his position if he could get a $20,000 profit, net of commissions.

Mathews admittedly undertook the role of acting as agent for Paul Ginn for the sale of his position in the earnest money agreement. Thereafter Mathews secretly offered the Tukwila property to his other principal, Allied, for $320,000. Allied accepted on November 8, 1976. This was a sale price $40,000 greater than the amount which would have been paid to the Banchero estate if the conditions of Ginn's earnest money were deemed satisfied, and a full $20,000 more than Ginn himself stated he would take to relinquish his right to buy the Tukwila property. By arranging an assignment of Ginn's position (instead of a direct sale between Allied and the Banchero estate), Allied could close the transaction for the original $280,000 price; and any additional amounts which the buyer was willing to pay could be collected "on the side" without the knowledge of the plaintiff.

On December 8, 1976, Allied wrote to plaintiff to advise him that his company had been assigned Ginn's interest in the earnest money agreement with the Banchero estate, and that the conditions of the earnest money were now deemed satisfied.

On January 10, 1977, some 12 days before the closing deadline of the Ginn earnest money agreement, Kidder, Mathews called plaintiff to request a 30–day extension of the closing deadline. Cogan was told that the request was related to Allied's financing of the purchase, but he was not told that the additional time was actually needed to accommodate the desires of the principals of Allied who wished to arrange personal financing so that they could purchase the Tukwila property as individuals rather than through their corporate entity. The plaintiff was not told, and he did not know that Kidder, Mathews was also acting as agent for Allied or that the realtors had a financial interest in the assignment consideration of $40,000. The plaintiff reluctantly agreed to the extension. As a result of the delay, the Banchero estate incurred an additional estate tax liability of $660.

When plaintiff discovered that the defendants had received a secret $20,000 profit, he instructed the closing officer to withhold payment of the $19,000 commission.

The plaintiff estate then sued to recover the $20,000 "secret commission," the $19,000 commission held in escrow, and the $5,000 earnest money deposit, which plaintiff alleged the defendant realtors had paid to themselves without authorization.

## DECISION

In *Mersky v. Multiple Listing Bureau of Olympia, Inc.,* 73 Wn.2d 225, 437 P.2d 897 (1968), a seller was allowed to recover a real estate commission, where the broker failed to disclose that the purchaser was a sister of the broker's subagent. Our Supreme Court in such case clearly outlined the duty of a realtor and its subagents to disclose all material matters of a real estate transaction:

> [W]e start from the general and basic premise that a real–estate brokerage firm with whom property is appropriately listed for sale becomes the agent of the seller for the purpose of finding a purchaser. And, from this agency relationship springs the duty and the obligation upon the part of the listing broker, as well as on the part of his subagents, *to exercise the utmost good faith and fidelity toward his principal, the seller, in all matters falling within the scope of his employment.*
>
> Furthermore, there flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill, and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self–dealing with that property, without the explicit and fully informed consent of the principal; and to make, in all instances, *a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is*

*employed, and which might affect the principal's rights and interests or influence his actions.*

. . .

The obligation thus imposed upon the broker, and a participating subagent, springs from and is predicated upon the same policy considerations which give rise to the rule prohibiting self–dealing by an agent, namely, to assure the principal that he may have and rely upon the impartial and unreserved fidelity of his agent throughout the course of the transaction for which the agent was employed. . . .

Consistent with the policy of preventing a broker or his subagents—without the informed consent of the principal—from intentionally or carelessly entangling the affairs of the principal with ties of the agent's kin, is the corollary rule that such dealings by a broker, or his subagents, without the required disclosure, amount to fraud in law. *This, in turn, entitles the principal, upon discovery of the undisclosed relationship, to rescind the transaction, recover any profit gained by the broker from the transaction, or recoup the commission paid to the broker by virtue of the transaction. Curotto v. Hammack,* 362 Mo. 457, 241 S.W.2d 897 (1951); 26 A.L.R.2d 1307 (1952).

(Citations omitted. Italics ours.) *Mersky v. Multiple Listing Bureau of Olympia, Inc., supra* at 228–31.

 The rule that a real estate broker's duty of loyalty extends beyond the date of the earnest money agreement he procures was applied in the California case of *Menzel v. Salka,* 179 Cal. App. 2d 612, 4 Cal. Rptr. 78 (Cal. Dist. Ct. App. 1960). There a real estate broker located a purchaser who, in turn, submitted an earnest money agreement accepted by the sellers. However, before the sale was closed, the purchaser informed the broker that she was unable to complete the purchase. The broker did not disclose this development to the sellers, but instead offered to purchase the property directly from the reluctant buyer. A second escrow account was established and a double closing was accomplished without the knowledge of the sellers. When the sellers discovered what had happened, they sued their disloyal agent to recover his commission and a "secret

profit." The broker defended by asserting that there was no breach of loyalty and no "secret profit" since his actions came *after* he had procured a valid earnest money agreement for the sellers. The California court rejected this defense.

A Washington case factually close to the subject case was *Investment Exch. Realty, Inc. v. Hillcrest Bowl, Inc.*, 82 Wn.2d 714, 513 P.2d 282 (1973). This was an action by a real estate broker to recover a commission for negotiation of a lease. The question presented was whether a broker has a duty to expressly disclose a dual agency in which the broker represented both the lessor and the lessee. The result of extensive negotiations was a lease substantially less favorable to the lessor than the lease initially discussed. The court, on finding a breach of the broker's fiduciary relation and allowing lessor to recover the commission, stated at page 717:

> The crucial question is whether a broker has a duty to expressly disclose a dual agency relationship. We hold there is such a duty.
>
> It was said in *Brandt v. Koepnick,* 2 Wn. App. 671, 674, 469 P.2d 189 (1970) that a "dual agency relationship, while extremely delicate, is permissible when both parties have full knowledge of the facts and consent thereto." In this instance there is no showing the parties consented thereto. Further, the above–quoted finding of fact No. 8 did not say appellant knew of the dual agency, only that he "knew or should have known." The test stated in *Brandt* is not met herein. *That test can only be met by a clear and express disclosure of the dual agency relationship with consent thereto by both principals.*
>
> . . .
>
> A case particularly in point is *Ramsey v. Sedlar,* 75 Wn.2d 901, 908, 454 P.2d 416 (1969) in which the matter of a brokerage commission was in controversy. Therein it was specifically held that if brokers "unilaterally undertook to promote a significant interest of the prospective purchasers of appellants' property they breached their duty of loyalty to an extent warranting a forfeiture of their commission."

Because of respondent's failure to expressly disclose the dual agency relationship and obtain appellant's consent thereto, the judgments of the trial court and of the court of appeals must be and are hereby reversed.

(Italics ours.) *Investment Exch. Realty, Inc. v. Hillcrest Bowl, Inc., supra* at 717–18.

*See also* 1 Continuing Legal Educ. Comm., Wash. State Bar Ass'n, *Washington Real Property Deskbook* §§ 2.27, 2.28, at 2–11 (1979).[1]

Although exhibit 5 is designated as an "earnest money agreement," it is conditioned on six different contingencies, three of which appear to be at the sole discretion of the purchaser. The document itself is more in the nature of an option to purchase. Although the earnest money agreement provided for a $5,000 earnest money deposit, this was in the form of a check with the added language that it was not to be deposited until the sale closed. In effect, Ginn tied up the Tukwila property at a fixed sale price of $280,000 without any consideration whatsoever. The effect of this was that the Banchero estate was bound to the agreement for 90 days but the purchaser Ginn could walk away without any responsibility or monetary penalty.

An examination of the record indicates that the defendant realtors undisputedly represented three different parties as their agent involving the same transaction. This they cannot do without complete disclosure to all principals.

---

[1] "b. (§ 2.27) Financial Interest

"A direct financial interest of the brokers, of any kind or nature in the purchased property or with the purchaser, including use of the earned commission for a participating share in the purchase, *is prohibited without full disclosure. Meerdink v. Kreiger,* 15 Wn. App. 540, 550 P.2d 42 (1976); *Frisell v. Newman,* 71 Wn.2d 520, 429 P.2d 864 (1967).

"D. (§ 2.28) Duty of Due Care

"Totally aside from the obligations of the broker to exercise the utmost good faith and loyalty to his principal, the broker is, by his professional status as a licensed real estate broker, held to a duty of due care in the performance of his profession. *This includes the disclosing of all material facts to a seller or purchaser insofar as the broker comes into possession of such facts. Monty v. Peterson,* 85 Wn.2d 956, 540 P.2d 1377 (1975)." (Italics ours.)

Defendant realtors were the agents for the Banchero estate from the moment that the property was listed for sale and such agency relationship continued until the sale was closed. By being the agent of the estate, they were obligated to exercise reasonable care, skill and judgment in securing for plaintiff the best bargain possible; to scrupulously avoid representing any interests antagonistic to that of the plaintiff in a transaction involving the estate's property, or otherwise self–dealing with that property, without the explicit and fully informed consent of plaintiff. They were also obligated in all instances to make a full, fair and timely disclosure to the plaintiff of all facts within the knowledge or coming to the attention of the defendants which are, or may be material in connection with the matter for which defendants were employed, which might affect the plaintiff's rights and interest and influence his actions.

From the testimony of the parties and our review of the record, we hold as a matter of law that the defendant realtors breached their fiduciary duty to plaintiff by their failure to disclose the following material facts:

1. They failed to inform Cogan that they had undertaken to represent Ginn and were trying to promote an assignment of his optional position to a buyer willing to pay more for the Tukwila property.

2. They failed to disclose the fact that Ginn had agreed to assign his position for $20,000.

3. They failed to disclose that Allied had retained defendant realtors as its exclusive agent for purchase of property in the area and that it was particularly interested in purchasing the Banchero property for $320,000.

4. They failed to inform Cogan of the true reasons for asking for the 30–day extension of the escrow closing.

5. They failed to disclose that they had a side deal with Ginn that they would assign Ginn's position on the earnest money agreement between the estate and Ginn for $40,000 and that they would split the proceeds.

6. That the defendants intended to collect a real estate fee of $19,000 plus an additional commission of $20,000, or approximately 14 percent on a sale of $320,000.

We hold that the failure of the defendant realtors to make a disclosure of the above recited material facts of the sale was fraud in law entitling plaintiff to rescind the transaction or recoup the commissions paid to defendants.

The judgment in favor of defendants is reversed and remanded to the trial court for the purpose of entering judgment for the plaintiff against the defendants in the amount of $25,000 ($20,000 defendants had received from Allied, plus the $5,000 earnest money deposit which defendants had paid to themselves). Such judgment shall further provide that the $19,000 paid into the registry of the court by the escrow company shall be awarded to plaintiff.

We also affirm the judgment of $660 in favor of plaintiff against the defendants.

JAMES and WILLIAMS, JJ., concur.

Reconsideration denied November 6, 1979.

Review granted by Supreme Court February 15, 1980.